**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-03301-DDD-NRN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

PATRICK PIPKIN, a/k/a Patrick Leroy Pipkin, a/k/a Patrick-Leroy:Pipkin,
BRYAN HAMMON, a/k/a Bryan Hugh Hammon, and
UNKNOWN INDIVIDUALS WHO ENGAGED IN UNLAWFUL FENCING OF THE
HALLAR DEED AREA OR WHO HAVE OTHERWISE ACTED IN CONCERT WITH AN
ASSOCIATION OF INDIVIDUALS CALLED THE "FREE LAND HOLDER COMMITTEE,"

     Defendants.

---

**MOTION FOR SUMMARY JUDGMENT AND ENTRY OF A PERMANENT
INJUNCTION AS TO DEFENDANTS PATRICK PIPKIN AND BRYAN HAMMON**

---

The United States of America moves under Fed. R. Civ. P. 56 for summary judgment on

all its claims against Defendants Patrick Pipkin and Bryan Hammon.[1] The Court should grant

summary judgment and enter permanent injunctive relief restraining Pipkin, Hammon, and anyone

acting in concert with them from: (1) placing any personal property on any land in the San Juan

National Forest without authorization from the United States; (2) inclosing in any way any portion

---

[1] The United States anticipates moving separately for default judgment against the FLHC
Defendants, who are unknown individuals who engaged in unlawful fencing of the public land at
issue in this case, or who have otherwise acted in concert with an association of individuals called
the "Free Land Holder Committee" (FLHC), and as to whom the Clerk of the Court entered default
on April 7, 2025. ECF No. 50.

of that land; (3) obstructing in any way the free passage to or transit over or through the land; and (4) otherwise interfering with the United States' or the public's lawful use of or access to the land.

## INTRODUCTION

This is a case about protecting access to public land. The land at issue, the Hallar Deed Area, is located near Mancos, Colorado. The United States owns the land, and the U.S. Department of Agriculture, Forest Service, administers it as part of the San Juan National Forest. The Hallar Deed Area is popular year-round for recreation and is used seasonally for livestock grazing.

In October 2024, Defendants Patrick Pipkin and Bryan Hammon, along with the FLHC Defendants, unlawfully obstructed free passage across a large portion of the Hallar Deed Area by clearing brush, sinking fenceposts, and stringing miles of barbed wire fence. Defendants did not have permission from the United States or any other legal right to do this. Around the same time, Pipkin signed documents on behalf of the FLHC that were publicly posted in Mancos and elsewhere. The documents made baseless claims to the Hallar Deed Area and purported to exercise the FLHC's self-proclaimed authority to decide who can use the land.

Days after Defendants first fenced the land, members of the public gathered and removed the fence. In November 2024, the United States filed this lawsuit seeking declaratory and injunctive relief to prevent Defendants from further unlawfully inclosing or obstructing the land.

Undeterred, Defendants continued to post public notices asserting that they own the land. And during this litigation, Pipkin and Hammon have relied on the deed that conveyed the land to the United States to assert that Defendants, not the United States, are the land's rightful owners.

The undisputed material facts establish that Defendants violated the Unlawful Inclosures of Public Lands Act of 1885, 43 U.S.C. §§ 1061-66, and trespassed on public land. The facts show

that injunctive relief is necessary to stop Defendants' unlawful activity, to protect federal land from further harm, and to shield the public from further restrictions on their access to public land.

### STATEMENT OF UNDISPUTED MATERIAL FACTS (SUMF)

**A. The Hallar Deed Area**

1.      The Hallar Deed Area is in Montezuma County, Colorado, near the town of Mancos, and is approximately 1,460 acres. Ex. 1, Declaration of David Tomaschow ¶4.

2.      The United States originally acquired the Hallar Deed Area through the Treaty of Guadalupe Hidalgo of 1848, 9 Stat. 922. *Id.* ¶7.

3.      The United States patented out the Hallar Deed Area under the Land Act of 1820 and the Homestead Act of 1862 over the course of several years from 1896 to 1913. *Id.* ¶¶9-21.

4.      Fred C. Hallar conveyed the land back to "The United States of America" by warranty deed on March 24, 1927. *Id.* ¶22.

5.      The 1927 conveyance was made in exchange for timber rights within the National Forest pursuant to the General Exchange Act of 1922. *Id.* ¶23.

6.      The Forest Service's file for the acquisition contains findings by the Commissioner of the General Land Office concluding that all applicable statutory and regulatory criteria necessary for the vesting of title in the United States were satisfied. *Id.* ¶24.

7.      The legal description of the lands conveyed in the 1927 deed is:

New Mexico Principal Meridian, Colorado
T. 37 N., R. 13 W.,
        sec. 21, E1/2;
        sec. 22, SW1/4NW1/4 and W1/2SW1/4;
        sec. 23, SW1/4NW1/4 and NW1/4SW1/4;
        sec. 27, W1/2NW1/4 and NW1/4SW1/4;
        sec. 28, E1/2, N1/2NW1/4, SE1/4NW1/4 and N1/2SW1/4NW1/4;

> sec. 29, NE1/4NE1/4, N1/2SE1/4NE1/4, W1/2NW1/4, NE1/4SW1/4,
> S1/2NE1/4SE1/4 and SE1/4SE1/4;
> sec. 30, SE1/4NE1/4 and W1/2SE1/4.

*Id.* ¶5.

8. The 1927 deed to the United States was filed in the United States Pueblo Land Office and then recorded with the Bureau of Land Management and with the Montezuma County Recorder. *Id.* ¶22.

9. The United States accepted title to the Hallar Deed Area on April 20, 1928. *Id.*

10. The Hallar Deed Area is part of an area called "Chicken Creek" within the Mancos/Dolores Ranger District of the San Juan National Forest. Ex. 2, Declaration of Nicholas Mustoe ¶4. The San Juan National Forest is part of the National Forest System (NFS). *Id.*

11. The Forest Service manages the Hallar Deed Area pursuant to statutory authority granted to the Secretary of Agriculture. *See* 16 U.S.C. §§ 478, 551; *see also* Ex. 2 ¶¶2-3.

12. Members of the public make frequent use of the Hallar Deed Area for recreation. *See* Ex. 2 ¶¶5-6, 42-43 (describing public uses); Ex. 3, Declaration of Bradley Finch ¶2 (describing use of the Chicken Creek area approximately four times a week for recreation and through civic involvement); Ex. 4, Declaration of Edward Archuleta ¶¶2-3 (describing use of the Chicken Creek area "almost every day" for recreation).

13. A school cross-country meet called the Chicken Creek Challenge has been held on trails in the Chicken Creek area for many years, with a recent permit for the event contemplating as many as 400 runners and 250 spectators. Ex. 2 ¶27; Ex. 5, Declaration of Brady Archer ¶3.

14. Members of the public also use the Hallar Deed Area for livestock grazing. Ex. 2 ¶¶7-8.

15.     Grazing is managed on allotments and authorized by permits issued by the Forest Service. *See Id.* ¶7.

16.     The Turkey Creek Permit is currently issued to Gerald and Carla Koppenhafer and Bruce and Elizabeth Tozer, who graze over 300 cattle from May 26th through October 15th. *Id.* ¶8.

17.     When the Koppenhafers remove their cattle from federal land in the fall, they typically herd their animals across the Hallar Deed Area and collect them near the southern boundary of the area near Hackley Reservoir. Ex. 6, Declaration of Gerald Koppenhafer ¶3.

**B.  Officer Bugosh's encounter with Defendants**

18.     On October 5, 2024, Forest Service Law Enforcement Officer Michael Bugosh received a report that a fence was being constructed in the Hallar Deed Area. Ex. 7, Declaration of Michael David Bugosh ¶5.

19.     When Bugosh responded, he encountered several vehicles and approximately four males in the vicinity of a newly constructed fence line within the Hallar Deed Area. *Id.* ¶8.

20.     Some of the individuals were riding off-highway vehicles along the fence line, and some were wearing heavy work gloves. *Id.*

21.     Shortly after Bugosh's arrival, a pickup truck arrived towing a trailer carrying fencing materials. *Id.* ¶17.

22.     Bugosh informed these individuals that he was responding to a report that a fence was being constructed on NFS land. *Id.* ¶9.

23.     The leader of the group asked for proof it was NFS land. *Id.* Bugosh showed the leader a map on his cell phone indicating they were on NFS land and offered to look up the land on the county tax assessor's mobile app. *Id.*

24.     Bugosh asked that the individuals identify themselves, but they did not do so. *See id.* ¶¶10-11, 21, 23.

25.     The leader, subsequently identified as Pipkin, asserted that the lands belonged to the "Republic" of the United States of America, which he claimed was a different entity than the United States. *Id.* ¶9-10, 22. He also said he is an "inhabitant" and a "free land holder." *Id.*

26.     Another individual, later identified as Hammon, explained that those present were FLHC members. *Id.* ¶24.

27.     Pipkin asserted that he and his companions had a claim to the land and provided Bugosh a copy of the 1927 Hallar deed. *Id.* ¶¶18-19.

28.     Pipkin suggested that the deed granted the land not to the United States but rather to the "Republic of the United States of America" of which Pipkin and the FLHC are members. *Id.* ¶16.

29.     Pipkin said that the fence would have openings of twelve and sixty-six feet where it intersected trails and roads, respectively. *Id.* ¶14.

30.     During Bugosh's encounter with Pipkin, several other adult males arrived, whom Pipkin identified as FLHC members. *Id.* ¶23.

31.     After consulting with his supervisor, Bugosh left the scene due to concerns over the number of individuals present and their refusal to identify themselves. *Id.* ¶21, 29.

32.     One or more Defendants continued constructing fencing in the Hallar Deed Area in the ensuing days. *See* Ex. 3 ¶¶7-17 (describing observations of FLHC Defendants building fence on October 8, 2024); Ex. 6 ¶16 (observing "a group of individuals near a set of skid steer tracks rapidly building fence" on the Hallar Deed Area).

**C.  Obstruction of public access to the Hallar Deed Area and other public land**

33.     A detailed description of the fence that Defendants erected on the Hallar Deed Area is set forth in the Declaration of Phil Strehle and accompanying exhibits. Ex. 8, Declaration of Phil Strehle ¶¶4-5 (describing Strehle's assignment to document the unauthorized fence).

34.     As described in Strehle's investigation, the boundary of parts of the Hallar Deed Area was marked with T-posts, marking whiskers, and flagging tied to trees. *Id.* ¶¶8-9.

35.     The land showed straight-line areas of disturbance along parts of the claimed boundary as well as ground disturbances where post holes had been dug. *Id.* ¶9-11.

36.     In some areas brush and trees had been cut or removed along the fence line. *Id.* ¶¶10, 12; *see also* Ex. 3 ¶9 (describing barbed-wire fence with "[a]n approximately 8 foot corridor [that] had been cleared of brush and smaller trees to accommodate the fence" and "ATV tracks [that] were clearly visible along the fence corridors"); Ex. 4 ¶6 (observing "fencing materials and H-Braces along my usual bike route" and "areas where the vegetation had been removed").

37.     While walking the boundary line, Strehle observed a stake with a metal cap on it, similar to a cadastral survey marker, inscribed with "Free Land Holder, Exclusive Equity and Sacred Honor," that was consistent with reports from community members who reported discovering other such markers. Ex. 8 ¶11.

38.     Strehle also walked other portions of the Hallar Deed Area boundary and found more metal stakes, flagging, and t-posts on the ground along with barbed wire. *Id.* ¶12.

39.     In total, Strehle estimated that approximately three miles of barbed-wire fence was fully erected along the boundary of the Hallar Deed Area and then later removed. *Id.* ¶13 & Ex. A. He estimated that fence posts had been installed but no barbed wire had been strung on an additional one mile of the claimed boundary. *Id.* He estimated markers had been placed along another approximately 2.5 miles of the Hallar Deed Area boundary. *Id.*

40.     The Forest Service did not give permission for any activity that Defendants engaged in with respect to the Hallar Deed Area, including fencing. Ex. 2 ¶47.

41.     Defendants' fence blocked at least one cross-country ski trail. *See* Ex. 3 ¶18.

42.     The fence obstructed the public's passage over the Hallar Deed Area as a whole, because the public freely ranges over the Hallar Deed Area without confining itself to designated roads or trails. *See* Ex. 2 ¶¶5-6, 46 (describing recreational uses both on and off official road and trail systems on the Hallar Deed Area and vehicle traffic within a 300-foot right-of-way to either side of motorized routes); Ex. 4 ¶3 (stating that use of the land occurs "both on and off designated roads and trails"); Ex. 3 ¶¶4-5 (describing off-trail use of the land and "numerous unofficial 'social' trails in the Chicken Creek area that have been created by users and cattle leaving designated roads and trails"); Ex. 6 ¶¶4-5 (describing ranching and other activities that "are not confined to any road or trail").

43.     The property boundary that Defendants claimed, surveyed, and partially fenced intersects with both official trails and several unofficial trails and decommissioned logging roads that members of the public use for recreation. Ex. 2 ¶42.

44.    The fence threatened to trap or injure wildlife known to be in the area. Ex. 3 ¶40.

45.    The openings in the fence were such that Defendants could have easily closed them at any time. *See* 4 ¶5 (observing H-braces near roads on which gates could have been installed); Ex. 3 ¶15 (observing "gaps in the fence at certain roads and trails" where "gates could easily and quickly be installed to block the gaps and access" and recounting Hammon's statement that the FLHC "had not yet decided how they would manage the gaps").

46.    The fence threatened to interfere significantly with the seasonal movement of cattle out of the Hallar Deed Area by creating wedges that could have trapped animals, blocking the path near Hackley Reservoir that ranchers use to move their herds off public land, degrading available forage, and diverting ranchers' attention from their ranching operations. Ex. 6 ¶9-14, 22; Ex. 3 ¶39.

47.    The fence also cut off a reservoir that Dr. Koppenhafer, one of the grazing permittees, maintains on the Hallar Deed Area with Forest Service permission. Ex. 6 ¶10.

48.    Because of Defendants' actions, the 2024 Chicken Creek Challenge was relocated to public land farther away from the Hallar Deed Area. *See* Ex. 2 ¶27; Ex. 5 ¶¶1-2, 4-5.

49.    Race organizers concluded that the fence was close enough to the planned racecourse (approximately 700 meters) that they did not think it would be safe to hold the event where it was originally planned. Ex. 5 ¶¶4-5.

**D.  Defendants' refusal to remove the fencing**

50.    On October 9, 2024, District Ranger Nicholas Mustoe met with Pipkin. Ex. 2 ¶¶11-20.

51.     Mustoe hand-delivered to Pipkin a letter stating that the fence was in trespass and requesting that Pipkin remove it immediately. Ex. 2 ¶¶14-15.

52.     Pipkin did not agree to remove the fence and instead claimed that the Forest Service did not have authority to issue the letter. Ex. 2 ¶¶16-19.

53.     Bradley Finch, a local resident who helps maintains the Chicken Creek area as a volunteer, also asked Hammon to remove the fence to defray community tensions, but Hammon refused. Ex. 3 ¶¶23-25.

54.     The Forest Service later sent an impound notice to Pipkin demanding that he remove the fencing materials Defendants had placed on the Hallar Deed Area. Ex. 2 ¶44.

55.     The notice was never picked up at either of the addresses to which it was sent. Ex. 2 ¶45.

**E.  Local residents' encounters with Defendants**

56.     Members of the public have observed Defendants engaging in fencing activity on the Hallar Deed Area. *See* Ex. 3 ¶¶8-17, 21, 23-25, 30-31; Ex. 6 ¶¶16, 21.

57.     In those interactions, Hammon and other FLHC Defendants asserted claims to the land. Ex. 3 ¶¶11, 14, 21, 23-25; Ex. 6 ¶21.

58.     One of the FLHC Defendants said they were building the fence to make their claim to the land. Ex. 3 ¶11.

59.     Hammon also explained to Finch that the FLHC had been planning for years to fence the land to make their claim. *Id.* ¶16.

**F.  Local residents' dismantling of the fence**

60.    Because the public uses the Hallar Deed Area so extensively, it has taken a close interest in Defendants' actions. *See* Ex. 2 ¶¶21, 28-32.

61.    On October 10, 2024, local residents began dismantling Defendants' fence. Ex. 3 ¶¶26-29; Ex. 6 ¶¶17-20.

62.    Over the ensuing days, the public continued taking down the fence. Ex. 3 ¶¶30-33, 36; Ex. 4 ¶¶6-7; Ex. 6 ¶21, Ex. 2 ¶¶23-26.

**G.  Pipkin's proclamations and notices asserting claims to the land**

63.    Starting on October 9, 2024, and continuing into December 2024, Pipkin signed several documents that were then publicly posted that purport to exercise control over or lay claim to the Hallar Deed Area. Ex. 4 ¶¶10-16; Ex. 2 ¶¶32-41.

64.    On October 9, 2024, a document titled "Proclamation 001," signed by Pipkin as "Ambassador" for the FLHC, was posted at the Mancos Post Office. Ex. 4 ¶11 & Attach. A.

65.    Proclamation 001 states that the FLHC would not block existing easements and other uses. *Id.* But it states that "existing cattle grazing rights" or "agreements issued prior to any claims by the Free Land Holders" would "be honored until expiration of the annual year of 2024." *Id.*

66.    Nowhere does Proclamation 001 reference any deed or other legal basis for Defendants' right or title to the Hallar Deed Area. *See generally id.*

67.    On October 18, 2024, another document titled "Notice of Claim" signed by Pipkin was posted at the Mancos Post Office. Ex. 4 ¶12 & Attach. B.

68.    The document sets forth a legal description matching the 1927 Hallar deed and making a claim to the land on behalf of the FLHC. *Id.*; Ex. 1 ¶27.

69.    The notice states that "all those with an equal, previous or superior claim" must reply to the FLHC "by December 15, 2024 or be it [the FLHC's] claim has been resolved forever." Ex. 4 ¶12 & Attach. B.

70.    Substantially identical notices were posted at the Mancos Post Office on October 29, 2024, and on November 2, 6, 18, 21, and 25, 2024. Ex. 4 ¶¶13-16; Ex. 2 ¶¶34-39, 41.

71.    These documents do not identify any deed or other legal basis for Defendants' right or title to the Hallar Deed Area. *See generally* Ex. 4 Attachs. A-F; Ex. 2 Exs. F-M, P.

72.    The United States filed its Complaint on November 26, 2024. ECF No. 1.

73.    Two weeks later, on or about December 10, 2024, another substantially identical Notice of Claim was posted at the Cortez Post Office. *See* Ex. 2 ¶40-41.

## ARGUMENT

The United States has brought claims of unlawful inclosure[2] and unlawful obstruction under the Unlawful Inclosure of Public Lands Act of 1885 (UIA), 43 U.S.C. §§ 1061 and 1063, and a common-law trespass claim. Based on the undisputed material facts, the United States is entitled to summary judgment on all these claims as to Pipkin and Hammon, and the Court should enter a permanent injunction barring their continued interference with NFS lands.

---

[2] The case law refers interchangeably to an "inclosure" or to the modern spelling, "enclosure." *Compare, e.g. Camfield v. United States*, 167 U.S. 518, 521-22 (1897) (using both spellings) *with*, *e.g.*, *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1504 (10th Cir. 1988) (enclosure). The United States uses "inclosure" to be consistent with the statutory text.

**I.  Rule 56 permits the entry of judgment without trial if there is no genuine dispute of material fact.**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it pertains to an element of a claim or defense. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Id.* Once the moving party meets its burden, the nonmoving party must come forward with specific facts showing a genuine issue for trial. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

**II.  The United States is entitled to summary judgment on its UIA claims.**

The UIA "was intended to prevent the obstruction of free passage or transit for any and all lawful purposes over public lands." *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1509 (10th Cir. 1988) (emphasis deleted) (citation omitted). Section 1061 of the UIA prohibits the inclosure of public land and the baseless assertion of a right to the exclusive use and occupancy of public land. 43 U.S.C. § 1061. Section 1063 broadly prohibits any unlawful obstruction of public land, even if it is not an inclosure. *Id.* § 1063. The undisputed facts show that Pipkin and Hammon violated both provisions.

**A.  Defendants violated § 1061 by unlawfully inclosing the Hallar Deed Area.**

Section 1061 of the UIA prohibits the unpermitted "inclosure" of public lands. *Id.* § 1061. In *Iron Bar Holdings, LLC v. Cape*, 131 F.4th 1153 (10th Cir. 2025), *cert. docketed* (July 18, 2025), the Tenth Circuit confirmed that the term "inclosure" must be read broadly.

In that case, a ranch owner put up signs and a short chain where the ranch met public lands

at a point in a checkerboard pattern. *Id.* at 1156. The owner did so to try to prevent hunters from

"corner-crossing," *i.e.*, stepping diagonally from one parcel of public land to another by crossing

over the point where the public and private parcels met. *Id.* While the hunters did not physically

step onto private land when stepping over the corner, they did invade private airspace. *Id.* The

barrier was just at the corner, with "no other posts, fencing, or buildings within a quarter mile of

the corner" other than the signs and chain. *Id.* at 1162.

Even though the barrier did not fence in the land, the Tenth Circuit ruled that this barrier

was an unlawful inclosure of public land under the UIA. *Id.* at 1168. It explained that an

"inclosure" is "the act of freeing land from rights of common, commonable rights."[3] *Id.* at 1167-

68 (quoting Black's Law Dictionary (1891)). The court then explained that such an "inclosure"

that claims public rights can include a barrier (not just fencing), or even just a sign:

> ...[Section] 1061 makes clear that the statute applies to "all inclosures of
> any public land," not just those done through fencing. 43 U.S.C. § 1061. As
> Wyoming territorial justices observed long ago, "[t]he fence is made for
> beasts; the law is made for man." *United States v. Douglas-Willan Sartoris
> Co.*, 3 Wyo. 287, 22 P. 92, 97 (Wyo. 1889) ("[A] legal obstacle ... presents
> an impassable barrier."). So a purely legal barrier erected by "no
> trespassing" signs—like a virtual wall—could be considered an inclosure
> under the UIA.

*Id.* at 1168 (emphasis added); *see also id.* at 1168-74 (noting that "the UIA's prohibition on

inclosures includes non-physical barriers" and surveying cases). In sum, an inclosure under the

UIA includes a barrier that obstructs—and thus effectively asserts a private right to—public land.

---

[3] In the Tenth Circuit, the fencing person's intent is irrelevant in determining whether a barrier is
an inclosure. *Id.* at 1175 n.32.

Courts have also recognized that a fence can amount to an unlawful inclosure under the UIA even if it has openings or gates. *See Lawrence*, 848 F.2d at 1511 ("The mere presence of gates or openings in a fence does *not* mean the enclosure is lawful."); *see also Stoddard v. United States*, 214 F. 566, 568 (8th Cir. 1914) (openings in a fence do not make the fence lawful where they are insufficient "for the free passage of stock"); *cf. Golconda Cattle Co. v. United States*, 214 F. 903, 908 (9th Cir. 1914) ("[A]n inclosure is the assertion of a claim of some right or title to the premises inclosed, and it operates as a notice to others of such claim.") (citation omitted).

Here, Defendants unlawfully inclosed the Hallar Deed Area by marking off (and in some areas, fencing) the land and claiming ownership of it. SUMF ¶¶25, 27-28, 34, 37-39, 52, 57-59, 63-73. While Pipkin claimed that the fence had openings where it crossed some roads and trails, Defendants could easily have closed those openings at any time, and the fence did not allow the public full access to the 300-foot right-of-way it enjoys for motor vehicle use in the Hallar Deed Area. SUMF ¶¶29, 42, 45. While the fence did not fully surround the Hallar Deed Area, that was only because the public stopped Defendants from finishing it. *See* SUMF ¶39 (documenting over three miles of unfinished or surveyed fence line); *id.* ¶58 (Hammon stating that Defendants were fencing the land to claim it); *id.* ¶¶67-73 (describing notices that claimed the land and included a land description of the Hallar Deed Area). Defendants' statements to the public, their Notices of Claim, and the fence line that they had surveyed but not yet fenced demonstrate their intent to fully fence the land. *See* SUMF ¶¶25, 27-28, 34, 37-39, 52, 57-59, 63-73. Defendants did all this without permission from the United States, which owns the Hallar Deed Area. SUMF ¶¶4, 6, 8-9, 40. The undisputed facts thus establish that Defendants, including Pipkin and Hammon, unlawfully inclosed the Hallar Deed Area.

**B. Defendants also violated § 1061 by making a baseless assertion of title.**

Section 1061 also prohibits a person from making an unfounded assertion of ownership of the land—specifically, "the assertion of a right to the exclusive use and occupancy of any part of the public lands of the United States in any State or any of the Territories of the United States, without claim, color of title, or asserted right as above specified as to inclosure." 43 U.S.C. § 1061.

Here, Defendants have made a spurious claim of title to the land. Pipkin signed a series of posted notices baldly asserting that the land belongs to the FLHC and that the FLHC is the owner who may permit continued use of the land and suggesting that the FLHC may not honor any existing rights going forward. SUMF ¶¶63-73. Hammon has made similar assertions to Forest Service personnel and the public. SUMF ¶¶53, 57-59. Defendants, including Pipkin and Hammon, thus separately violated § 1061 through their baseless assertions of title.

**C. Defendants also violated § 1063 through unlawful obstruction of public land.**

The UIA also prohibits actions that obstruct free passage over federal lands regardless of whether they are an inclosure. 43 U.S.C. § 1063. Section 1063 applies to obstructions of both people and animals. *See Lawrence*, 848 F.2d at 1508 (ruling that § 1063 applies to the obstruction of wildlife).

Here, Defendants' fence obstructed, or threatened to obstruct, the free passage of people and animals over the Hallar Deed Area and other public land. Among other things, the fence:

- Cut a miles-long swath through an area over which the public freely ranges when using the land (SUMF ¶¶34-39, 42-43);

- crossed at least one cross-country ski trail (SUMF ¶41);

- threatened to trap or injure wildlife (SUMF ¶44); and

- threatened to trap cattle and otherwise interfered with lawful ranching operations (SUMF ¶46).

Defendants' actions also obstructed the public's use of NFS land by creating a fear of future disruptive activity, as shown through relocation of the Chicken Creek Challenge cross-country meet. SUMF ¶¶48-49.

The United States is entitled to summary judgment on its unlawful obstruction claim.

### III. The United States is entitled to summary judgment on its trespass claim.

The United States may bring suit to protect its property against trespassers. *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917); *Camfield v. United States*, 167 U.S. 518, 524 (1897). A person is liable for trespass if they intentionally enter land in the possession of another or fail to remove from the land a thing which they are under a duty to remove. Restatement (Second) of Torts § 158; *see also United States v. Osterlund*, 505 F. Supp. 165, 167 (D. Colo. 1981) (applying Restatement to federal trespass action); *Pub. Serv. Co. of Colo. v. Van Wyk,* 27 P.3d 377, 389 (Colo. 2001)) (citing Restatement in defining trespass in Colorado).

Here, the undisputed facts establish all the elements of trespass. The Hallar Deed Area belongs to the United States. SUMF ¶¶4, 6, 8-9; *cf. also* Colo. Rev. Stat. § 38-30-113(3) ("Every deed in substance, in a form... permitted by Colorado law, ... when properly executed, is a conveyance to the grantee...."); *United States v. Weiss*, 469 F. Supp. 2d 941, 951 (D. Colo. 2007) ("[I]n Colorado, it is the execution of the deed coupled with its delivery that effects conveyance to real property."). Defendants, including Pipkin and Hammon, intentionally entered the Hallar Deed Area and erected fencing without the United States' permission. SUMF ¶¶18-40. And Defendants failed to remove their fencing materials from the Hallar Deed Area despite being instructed to do so. SUMF ¶¶50-55.

\*    \*    \*

The United States is entitled to summary judgment on all its claims as to Pipkin and Hammon.

## IV. The Court should enter a permanent injunction barring further unlawful interference with NFS lands.

Congress has empowered the Court to issue injunctions to restrain UIA violations. 43 U.S.C. § 1062; *see also Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 971 (10th Cir. 2019) ("Federal district courts have the power to order injunctive relief when equity so requires.") (citation omitted). To obtain a permanent injunction, a party must show: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1164 (10th Cir. 2013). The third and fourth factors merge when the government is a party.[4] *See, e.g.*, *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) ("When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge."); *see also Ortega v. Grisham*, --- F.4th ----, No. 24-2121, 2025 WL 2394646, at \*3 (10th Cir. Aug. 19, 2025) (merging factors where the injunction is sought against the government). Here, all the factors weigh in favor of an injunction.

**Success on the merits**. As explained above, the undisputed material facts establish that the United States is entitled to judgment in its favor on all its claims.

---

[4] While the Tenth Circuit has only merged these factors when the government is the nonmovant, there is no reason not to do so where the government is the party seeking injunctive relief. Regardless, either formulation supports entry of an injunction in this case.

**Irreparable harm**. Without an injunction, the United States and the public will face substantial irreparable injury that monetary damages would not address. Public access to land was obstructed when Defendants threatened to cut off access to the Hallar Deed Area. SUMF ¶¶33-49. Defendants impeded access to a substantial tract of public land by rapidly and unilaterally erecting miles of barbed-wire fence. *Id.* Defendants also destroyed significant vegetation in the area. *See* SUMF ¶36, 46. At the same time, Defendants also posted repeated notices laying claim to the land and implying that Defendants would cease to respect the public's rights to NFS lands in the future. SUMF ¶63-73. Their provocations led the public to take action to remove Defendants' fence. SUMF ¶¶60-62. And Pipkin and Hammon have signaled that they will continue to make baseless claims to the land. *See, e.g.*, ECF No. 56 at 5 (claiming that the United States is estopped from contesting Defendants' claim due to this Court's "acquiescence"). A money judgment would not leave the public secure in their access to the Hallar Deed Area. Only an injunction would do that.

**The balance of the equities and public interest**. The balance-of-the-equities/public-interest factor weighs entirely in favor of an injunction. The United States is acting to protect lawful access to public land and to protect the public from interference. Defendants, in contrast, are seeking to unilaterally assert an unfounded land claim despite their knowledge that the United States holds the deed to the land and does not consent to their actions. Defendants would suffer no "harm" from being forced to forgo illegal activity.

At the same time, the public has a strong interest, as expressed through Congress in the UIA, in unfettered access to public land including the Hallar Deed Area. *See, e.g.*, 43 U.S.C. § 1063 (prohibiting any obstruction of free passage over public land). Indeed, the local Mancos community cherishes this land. *See* SUMF ¶¶12-14, 60. The requested relief would therefore honor

the public's interest in continued lawful access to NFS land and lessen the likelihood of future conflicts between Defendants and the public.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court grant summary judgment and enter an injunction.

Dated: September 10, 2025.                     Respectfully submitted,


PETER MCNEILLY
United States Attorney


*s/ V. William Scarpato III*
Jennifer R. Lake
V. William Scarpato III
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0407
Victor.Scarpato@usdoj.gov

Counsel for the United States of America

**CERTIFICATE OF COMPLIANCE UNDER DDD CIV. P.S. III(A)(4)**

I certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1). The pleading contains 5,461 words including footnotes and excluding the caption, signature block, certificate of service, and this certificate of compliance.

*s/ V. William Scarpato III*
V. William Scarpato III

## CERTIFICATE OF SERVICE

I certify that on September 10, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following recipients by e-mail:

None.

and I certify that on the same date I am causing the foregoing to be delivered to the following non-CM/ECF participants in the manner (mail, email, hand delivery, etc.) indicated by the nonparticipant's name[5]:

Patrick Pipkin (U.S. mail and email)
15276 Road 39.9
Mancos, CO 81328

P.O. Box 841616
Hildale, UT 84784

patpip28@gmail.com

Bryan Hammon (U.S. mail and email)
15276 Road 39.9
Mancos, CO 81328

645 N. Homestead St., 1823
Hildale, UT 84784

alaskanflyer@hotmail.com

_s/ V. William Scarpato III_
V. William Scarpato III

---

[5] No contact information is presently known for the unidentified Defendants.